**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Lisa Hymes,**

                    *Plaintiff,*

**v.**                                                    **Case No. 3:21-cv-304**
                                                         **Judge Thomas M. Rose**

**Secretary of the Air Force,**

                    *Defendant.*

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DOC. 16, AND TERMINATING CASE.**

---

Pending before the Court is Defendant's Motion for Summary Judgment. Doc. 16. Therein, Defendant, Secretary of the Air Force, requests that the Court grant summary judgment on Plaintiff Lisa Hymes' claims of discrimination and hostile work environment. Because Plaintiff has no direct evidence that Defendant's decisions not to promote Plaintiff were motivated by gender animus, and because she has no evidence to disprove Defendant's asserted non-discriminatory reasons for promoting others, and because there is no evidence of a hostile work environment or retaliation, Defendant's motion will be granted.

**I.      Background**

Plaintiff  Lisa Hymes has worked for Defendant since 2009 as a facility assistant responsible for customer service in the Civil Engineer Squadron, Requirements and Optimization

1

Center, better known as CEOER at the Wright Patterson Air Force Base. Plaintiff enjoyed her early years at WPAFB. However, in 2011-2012, Plaintiff and a fellow facility services assistant asked the Base for a desk audit to determine if their job positions were appropriately graded as a GS-7 position or whether a higher rating to GS-9 with additional pay was warranted (Plaintiff's Dep., Doc No. 13-1 at Page ID 124; 128). Base management asked Lisa and her co-worker not to pursue the desk audit, but they persisted in doing so.

Plaintiff asserts that because she was one of the individuals who initiated the audit, management was "after her." (Id at Page ID 329.) One of Plaintiff's supervisors, Chris Greene, told her to be careful not to file grievances. A second line supervisor Frank Boaz told her "I fire people that file grievances." (Plaintiff's Dep. Docket No. 13-1 at Page ID 152-153). Plaintiff has filed for over twenty positions at WPAFB, but two suspensions she has received have precluded her advancement. (Id at Page ID 162.)

The parties do not dispute that Plaintiff at all relevant times herein was the only African American employee in her department (Lisa Hymes Declaration Docket No. 14-3, Page ID 530). It is also not disputed by the parties that Plaintiff suffers from a disability due to a back condition which at times limits her ability to move or work (Id at Page ID 249-261). When she is in pain, Plaintiff needs to take medication and "can't function." Plaintiff is limited in moving and walking which further limits her ability to do her job. (Id at Page ID 256-258.)

In February and March 2017, Plaintiff was experiencing flares of back pain. Id. at Page ID 053. In January 2017, Plaintiff had submitted a letter from her doctor indicating she would require a leave of absence for a medical condition from January 30, 2017, to February 13, 2017. (January 30, 2017, Medical Note, Doc. No. 14-2 at Page ID 515). This leave was approved by Plaintiff's

supervisor, Daniel Jessup, as leave without pay. On February 15, 2017, the day that Plaintiff's initial approved leave expired, Plaintiff's husband emailed Jessup to inform him that Plaintiff was still undergoing treatment (Doc. No. 14-6 at Page ID 567-568). Jessup responded to the email asking for an additional doctor's note so he could ensure that Plaintiff was not listed as absent without leave. Plaintiff's husband complied and on February 21 provided a medical form indicating that Plaintiff was being treated for back pain and "will be completing physical therapy mid March 2017." (Doc. No. 14-7 at Page ID 569-70). Although the form contains a check box for "is not recommended to return to work/school," this box is not checked. (Id.)

Jessup sent a text message on February 22, 2017, stating "I need medical documentation that covers all absences and specifies that you were incapacitated for duty for the entire period covered by the statement, as well as an estimate of expected date of full or partial recovery." (February 22, 2017, Text Exchange, Doc. No. 14-8 at Page ID 571). Plaintiff's response to Jessup was "Harassment is a no no please send all messages to lchymes@woh.rr.com stop texting my phone." (Id.) Plaintiff submitted an additional medical note on March 1, 2017, indicating that Plaintiff, "will require absences from work for medical appointments in the next few months and she is unsure if she will be able to work a full duty day at this time." (Doc. No. 14-9 at Page ID 572.)

Seven days later, March 8, 2017, Jessup informed Plaintiff that her doctor's note did not meet Air Force standard for appropriate medical documentation for her absences. (Doc. No. 14-10 at Page ID 573). Plaintiff checked with her union representative who believed that her note was sufficient. (Plaintiff's Depo. Doc. 13-1 at Page ID 315; 19-24.) However, on March 13, 2017, her union representative also noted that proper documentation "should state the … estimated duration

of leave," information that was missing from the March 1, 2017, medical note. (Id. at Page ID 345:18-22; March 13, 2017, Email, Doc. No. 14-12 at Page ID 575).

Jessup waited 13 additional days and on March 21, 2017, emailed Plaintiff: "You were advised on 8 Mar[ch] that the medical documentation was insufficient and to date you have not provided any updated medical documentation. The medical documentation must provide a timeframe in which you are anticipated to be unable to work a full duty day." (March 21, 2017, Email, Doc. No. 14-11 at Page ID 574). Jessup's email also suggested that Plaintiff could go to Occupational Medicine "to obtain the specified clarifying information." (Id.)

Plaintiff's doctor had previously advised that it wasn't known at that time when she would be able to work a full duty day. (Doc. No. 14-9 at Page ID 572). Plaintiff also obtained a letter from the hospital commander and submitted that. Plaintiff's Depo. Exhibit 13-1 at Page ID 279. During this time period Plaintiff stayed home from work on February 15, March 1-3 and left work early on March 7, 8, 9, 10, 13, 16, 17, 21, and 22 due to her back condition. However, Plaintiff always turned in a leave slip and always attempted to contact Jessup personally. Jessup was not always in his office. (Plaintiff's Depo. Doc. No. 13-1 at Page ID 317.)

The Air Force's guidelines on sick leave state the following: sick leave for more than three consecutive work days must be supported by medical documentation which "must be administratively acceptable to the supervisor, must cover all absences beyond the third workday and specify that the employee was incapacitated for duty for the entire period covered by the statement" and "[a]s a minimum, the health care provider should be requested to provide an estimate of the expected date of full or partial recovery." (Id. at Page ID 544). According to the applicable Master Labor Agreement, "[w]hen an employee is out for more than three consecutive

4

workdays and attended by a physician, a certificate from the physician will be required." (Master Labor Agreement Excerpt, Doc. No. 14-5 at Page ID 565).

In the midst of Plaintiff's difficulties with back pain, Jessup approached Plaintiff on March 8, 2017, to tell her he wanted to provide her training on a new system for work orders. Plaintiff told him she would just read the book. However, Jessup persisted and as he walked away, he alleged he heard Plaintiff "make a noise" and so he asked her if she had an issue. Plaintiff told him no but shared a concern that she "didn't like the way" he had been treating her and that "the first time" Jessup yells at her, they "would have a problem." (Hymes Decl. January 8, 2017, Doc. No. 14-3 at Page ID 529).

Pursuant to AFI 36-703, Air Force Employees are expected to "discharge their assigned duties conscientiously and effectively, to comply in a timely manner with proper instructions or orders, treat other employees and stakeholders with respect and consideration, and maintain high standards of honesty, responsibility, and accountability." (Notice of Proposed Suspension October 13, 2017 ("October Suspension Notice"), Doc. No. 14-15 at Page ID 587). Jessup judged this interaction between himself and Plaintiff to be "discourteous." Plaintiff completed the training with Jessup without further incident.

Jessup documented that Plaintiff was absent without leave on March 1, 2, 3, 7 and 15 of 2017, failed to provide administratively acceptable medical documentation with associated AWOL, failed to request leave according to established procedures on February 14 and March 8, 9, 10, 13, 16, 17, 21 and 22 of 2017, and engaged in inappropriate conduct on March 8, 2017. (May 16 Suspension Doc. No. 14-13 at Page ID 578-83). Jessup issued a Notice of Proposed Suspension to Plaintiff on May 16, 2017. (May 16 Suspension, Doc. No. 14-13 at Page ID 578-83). Plaintiff

was suspended for five days. (Decision to Suspend dated June 27, 2017, Doc. No. 14-14 at Page ID 584-85).

Plaintiff asserts that no Caucasian employee in the department was charged with being absent without leave or placed on suspension for similar conduct involving medical documentation and that half the office arrived to work late, with no resulting discipline. Id at Page ID 187; 355, 266.

Plaintiff asserts no Caucasian employee in Plaintiff's work area had ever been issued a suspension for similar conduct (Lisa Hymes Declaration Docket No. 14-3, Page ID 530. Chris Greene, a Caucasian supervisor in Plaintiff's department and another Caucasian employee were involved in an intensive shouting match, which resulted in zero discipline for either employee. (Plaintiff's Dep. Docket No. 13-1 at Page ID 359).

Two months later, on August 31, 2017, Jessup called Plaintiff into his office and offered her to go to the Base's Employee Assistance Program (EAP) because she had indicated she was feeling stressed. (Jessup Decl., Doc. No. 14-1 at Page ID 515-16; October Suspension Notice, Doc. No. 14-15 at Page ID 586-88). Plaintiff, believing that her only problem was her daily interactions with Jessup, refused to take the letter, stated management is made up of liars, asserted that Jessup lies, and stated "the harassment needs to stop." (Plaintiff's Dep., Doc. No. 13-1 at Page ID 370:7-371:20; Hymes Decl. January 8, 2017, Doc. No. 14-3 at Page ID 531-32). Plaintiff asserts employees are not required to participate in such programs and that Plaintiff was not instructed by Jessup that this was a requirement.

Later, when presented with an interim notice for discourteous conduct related to the August 31 incident, Plaintiff laughed and stated, "you people are desperate, good luck with that"

6

and walked away. (Hymes Decl. January 8, 2017, Doc. No. 14-3 at Page ID 531-32). Jessup then issued Plaintiff a Notice of Proposed Suspension for discourteous conduct arising out of the August 31, 2017, incident. (October Suspension Notice, Doc. No. 14-15 at Page ID 586-88). After review including a written reply by Plaintiff, the Chief of Requirements and Optimization, David Burkholder, upheld the proposed suspension because "together with previous offenses," Plaintiff's behavior warranted suspension. (Decision to Suspend dated November 16, 2017, Doc. No. 14-16 at Page ID 589).

On November 9, 2021, Plaintiff filed an action in this court alleging her first, second, and fourth line supervisors treated her in a manner that constituted race discrimination, sex discrimination, disability discrimination and retaliation for engaging in protected activity in respect to her working conditions, and that she was subject to personal comments and conduct so severe and pervasive as to constitute hostile work environment. Doc. 1.

## II. Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323.   The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.   It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255.   If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726.   Rather, credibility determinations must be left to the fact-finder. *Id.*

8

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III.    Analysis

"[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Miles South Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020) (citation omitted). Title VII of the Civil Rights Act of 1964 prohibits federal agencies from employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). It is a violation of Title VII to fail to promote an employee because of his or her membership in a protected class. See, e.g., *White v. Columbus Metro. Hous. Auth.,* 429 F.3d 232, 240 (6th Cir. 2005). Plaintiff asserts she was discriminated against because of her gender.

A plaintiff may establish a claim of discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). The Sixth Circuit stated in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), that evidence that would require the jury to infer a fact is not direct evidence. Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are

disabled." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998). Plaintiff admits that neither Daniel Jessup nor Dave Burkholder (the final decisionmaker on her two suspensions) has ever said anything about her race. (Id. at Page ID 355:16-18, 357:1-4). Plaintiff has no direct evidence that any of the actions of which she complains were motivated by gender, leaving her to only the avenue utilizing circumstantial evidence established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973) to survive summary judgment.

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), when a claim is based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination, the elements of which vary slightly depending on the theory asserted. To establish a *prima facie* case of discrimination based on a "failure to promote" theory, a plaintiff must demonstrate that:

> (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for her position; and (4) she was treated differently than similarly-situated, non-protected employees.

*Black v. Columbus Pub. Sch*., 124 F. Supp. 2d 550, 565 (S.D. Ohio 2000). A plaintiff's burden at the *prima facie* stage is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The fourth prong of a *prima facie* case requires comparable employees to be similar to Plaintiff in all the relevant aspects. *Barry v. Noble Metal Processing, Inc*., 276 Fed. Appx. 477, 480 (6th Cir. 2008). The focus is on whether Plaintiff and the comparable employee share the same supervisor, are subject to the same standards, and have engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id.

10

Plaintiff identifies B.P.[1] (a white male) who she claims submitted a letter for his medical absences which was very similar to her March 1, 2017, letter. (Plaintiff's Dep., Doc. No. 13-1 at Page ID 443:1-444:20). Plaintiff claims Jessup deemed B.P.'s letter administratively acceptable medical documentation, despite deeming her March 1, 2017, letter not acceptable. (Id.)

However, as set forth in the Declaration of Cathy Guerrant, the Employee Management Relations Specialist assigned to the Customer Service section at the relevant time, Jessup did not deem B.P.'s referenced letter administratively acceptable. (Declaration of Cathy Guerrant ("Guerrant Decl.") Doc. No. 14-17 at Page ID 595- 96). In fact, Jessup asked B.P. to obtain a supplemental letter from Occupational Health. (Id.) B.P. did obtain an additional letter, which set forth start and end dates for his medical incapacitation. (Id.) Start and end dates were missing from Plaintiff's March 17, 2017, letter. (See March 1, 2017, Medical Note, Doc. No. 14-9 at Page ID 572 and March 21, 2017, Email, Doc. No. 14-11 at Page ID 574). Jessup asked both Plaintiff and B.P. to provide this additional information. (See March 21, 2017, Email, Doc. No. 14-11 at Page ID 574; Guerrant Decl., Doc. No. 14-17 at Page ID 595-96). Thus, Jessup treated B.P. no differently than Plaintiff regarding what he deemed to be administratively acceptable medical documentation.

Unlike B.P., Plaintiff refused to go to Occupational Health and at no time did she submit any additional letters setting forth the information Jessup requested numerous times. Thus, B.P. does not serve as an adequate comparator relating to acceptable medical documentation. Plaintiff identifies no other employee in the Customer Service section (or in the CEOER at large) being absent or leaving early for over half of an entire month without first acceptable medical

---

[1] By agreement between counsel, certain third parties are identified by their initials and redacted in the referenced exhibits (except for first initials) to protect their private health or disciplinary information.

documentation. She identifies no other employee in the Customer Service section (or in the CEOER at large) who continually left work early without informing her supervisor in advance. Nor has she identified any other employee in the Customer Service section (or in the CEOER at large) who was marked AWOL for over half the working days in a month. She cannot demonstrate Jessup treated her any worse than anyone else as relates to her first suspension for taking leave without following proper leave procedures. Nor does Plaintiff identify valid comparators as to her discourtesy suspensions.

Plaintiff does not deny much of her underlying behavior which formed the basis of the two suspensions for discourtesy. Rather, she argues that males in the office have done much worse to supervisors and did not get punished. She claims management treated two white males having a "straight out screaming match" in the hall and cursing each other out, the "boys just having a conversation." (Plaintiff's Dep., Doc. No. 13-1 at Page ID 359:8-25). However, that alleged screaming match was between Chris Greene, a supervisor in another section of the CEOER and one of the people he supervised. (Id. at Page ID 360:24-361:7). Jessup was not involved, and Plaintiff does not know if Greene made a complaint of that employee being discourteous against him. (Id. at Page ID 361:8-10).

Additionally, according to Plaintiff, Rick Villars was allegedly brought into a manager's office and told he was disrespectful to his supervisor and then told to return to his desk. (Id. at Page ID 438:1-440:12). However, the supervisor in question was Anita Penley-McConnell, not Daniel Jessup, and Plaintiff does not know any of the details regarding the alleged disrespect, save for "something about his phone not being on or something like that." (Id.)

Plaintiff also points to C.D., a white female in the Service Contracts division, who was spared a suspension and rather just given an annotation in her personnel folder for disrespecting her supervisor. (Id. at Page ID 422:4-23:23; 435:1-16). But C.D. did not work in the Customer Service section or under Jessup. (Id. at Page ID 422:10-19). And C.D.'s discipline was simply for one act of discourtesy; in contrast, Plaintiff's first suspension was for discourtesy and failure to follow proper leave procedures.

Plaintiff has not identified anyone who engaged in two different types of misconduct but were not disciplined. Plaintiff's second suspension was issued after she had already been suspended once for discourtesy. (Decision to Suspend November 16, 2017, Doc. No. 14-16 at Page ID 589). She has not identified any other employee in the CEOER who was suspended for misconduct, then committed the same misconduct again but was not again disciplined.

Because Plaintiff cannot identify an adequate comparator who was treated more favorably than her, she fails to make out her race and sex discrimination claims. Plaintiff believes the decisions to suspend her were based on her race because, outside of the Customer Service division, no one else has been suspended in all of the CEOER save for her and D.T., a black male who is a GS-13. (Plaintiff's Dep., Doc. No. 13-1 at Page ID 354:3- 355:15, 358:11-359:7). However, even if D.T. had been doing the same job as Plaintiff or had been supervised by Jessup, Plaintiff has provided no evidence about the circumstances of D.T.'s alleged suspension.

If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. If the defendant satisfies its burden, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination.

Once a defendant articulates a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to establish that the defendant's proffered reason was a pretext for discrimination. *Braithwaite v. Timken Co*., 258 F.3d 488, 493 (6th Cir. 2001). To show pretext, a plaintiff must be able to demonstrate both that the "reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

Defendant has articulated legitimate, nondiscriminatory reasons for the decisions to suspend Plaintiff. She failed to provide proper medical documentation, despite repeated requests, leaving her supervisor unable to plan for her coverage. (Jessup Decl., Doc. No. 14-1 at Page ID 511-12; Guerrant Decl., Doc. No. 14-17 at Page ID 595-96). Jessup asked for a start and end date for her restrictions, so that he could properly plan for her absences. He believed he needed to determine who would cover her work on the days she was out. (Jessup Decl., Doc. No. 14-1 at Page ID 511-12; Guerrant Decl., Doc. No. 14-17 at Page ID 595-96).

The Customer Service section in which Plaintiff works received nearly 18,000 work orders a year. (Jessup Decl., Doc. No. 14-1 at Page ID 511-12). When a customer needed assistance, he or she could call the Customer Service section or input a request through an online system, which generated a work ticket. (Plaintiff's Dep., Doc. No. 13-1 at Page ID 116:20-118:3). The facility services assistants, including Plaintiff, would manage the calls and work tickets by splitting up the hours of each workday among themselves and each person would address the calls and tickets that came in during their time bracket each day. (Id. at Page ID 118:6-119:7).

The supervisor's role was to ensure the facility services assistants were performing the duties they were tasked to perform. (Id. at Page ID 135:15-19; Jessup Decl., Doc. No. 14-1 at Page ID 511-12). If someone was out, the supervisor needed to ensure someone else was handling that

14

person's assigned work for the anticipated time period the person would be out. (Jessup Decl., Doc. No. 14-1 at Page ID 511-12). Despite Jessup's requests, Plaintiff did not obtain an additional medical note setting forth the beginning and end dates of her incapacitation, while continuing to miss work or to leave early without letting Jessup know in advance. (May 16 Notice of Suspension, Doc. No. 14-13, Page ID No. 578-83). This made it difficult for Jessup to ensure the work was getting done in the Customer Service section. Thus, Plaintiff was suspended for the legitimate, nondiscriminatory reasons.

Plaintiff also called management liars, initially refused to listen to Jessup's order to do the TRIRIGA training, threatened him from her cubicle by saying "the first time" Jessup yells at her, they "would have a problem" and implied Jessup used lies against her. (Id. at Page ID 362:16-363:25, 370:7-371:20; Hymes Decl. January 8, 2017, Doc. No. 14-3 at Page ID 529). She refused to accept paperwork he presented to her for the EAP program, called him and management "desperate" and laughed at him. (Hymes Decl. January 8, 2017, Doc. No. 14-3 at Page ID 531-32). Jessup could legitimately perceive these as instances of discourtesy, disrupting the Customer Service section, creating hostility, and undermining Jessup's ability to be an effective supervisor. (Jessup Decl., Doc. No. 14-1 at Page ID 513-14).

Hymes's supervisors were concerned that she continued to exhibit discourtesy to her supervisor, despite already being suspended once for discourtesy. (Decision to Suspend Dated November 16, 2017, Doc. No. 14-16 at Page ID 589-93). The second suspension was designed for "behavior modification and rehabilitating this employee to an acceptable level of conduct." (Id. at Page ID 593). Her discourtesy suspensions were upheld for legitimate, nondiscriminatory reasons, not because she is black or a woman.

15

Plaintiff's claim for discrimination based on physical disability fairs no better. In order to make out a *prima facie* case for discrimination under the Rehabilitation Act, a claimant must prove: (1) she is disabled, (2) she is qualified to perform the essential functions of the job either with or without reasonable accommodation, and (3) she is being discriminated against because of her disability. *Davis v. Flexman*, 109 F. Supp. 2d 776, 785 (S.D. Ohio 1999).

Plaintiff alleges her first suspension for failing to provide adequate medical documentation was issued because of her disability. She no longer claims her second suspension was made because of her disability. (Compare Complaint, Doc. No. 1, ¶ 12 at Page ID No. 3 with Plaintiff's Dep., Doc. No. 13-1 at Page ID 374:24-375:12). She was suspended the first time because she did not provide Air Force-required medical documentation to her supervisor regarding how long she would need to miss work because of her disability. (Decision to Suspend dated June 27, 2017, Doc. No. 14-14 at Page ID 584-85).

Jessup accepted her January 30, 2017, note providing specific dates she would be out of the office because of her disability. (January 30, 2017, Medical Note, Doc. No. 14-2 at Page ID 515; Plaintiff's Dep., Doc. No. 13-1 at Page ID 288:8-289:19; Hymes Decl. January 8, 2017, Doc. No. 14-3 at Page ID 525). He marked her LWOP as requested and did not suspend her, but when she failed to provide a note with specific dates for her absences in late February and March, he requested additional details which Plaintiff did not provide. (May 16 Suspension, Doc. No. 14-13 at Page ID 578-82). Plaintiff was thus suspended for the legitimate, nondiscriminatory reasons of failure to provide the requested medical documentation and failure to follow leave procedures which resulted in AWOL absences, not because she was disabled. Therefore, Plaintiff cannot make out a *prima facie* case that her suspension was based on her purported disability.

16

Neither can Plaintiff make out a claim for retaliation. Under Title VII, an employer cannot retaliate because an employee engages in protected conduct such as making a charge of discrimination or retaliation. 42 U.S.C. § 2000-e(3). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate: (1) she engaged in activity protected by Title VII; (2) defendant knew of this exercise of plaintiff's protected rights; (3) defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection between the protected activity and the materially adverse action. *Jones v. St. Jude Med. S.C.*, 823 F. Supp. 2d 699, 744–45 (S.D. Ohio 2011) (citing *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003) and *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 (2006)).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to come forward with a legitimate, non-retaliatory reason for the adverse action. (Id. at 745 (citing *Hicks*, 509 U.S. at 506–507). If the defendant gives a legitimate non-retaliatory reason, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for retaliation. Id. (citing *Hicks*, 509 U.S. at 512 n.4). The ultimate burden of showing that the defendant intentionally retaliated against the plaintiff remains at all times with the plaintiff. Id. at 745.

Plaintiff claims reprisal for her prior EEO activity led to various adverse actions against her: she was counseled for coming in late, accused of taking leave without approval, threatened with being charged AWOL, charged AWOL, advised there was no position for reassignment to a higher grade, and suspended twice. (Complaint, Doc. No. 1, ¶¶ 10-12 at Page ID 2-3.)

Plaintiff cannot demonstrate that many of these actions were materially adverse. Nor can she demonstrate that any of these actions were undertaken because of her protected activity.

17

The Supreme Court has held that alleged retaliatory actions must be "materially adverse" to be actionable. *White*, 548 U.S. at 68. Although "materially adverse" is a lesser standard than the "adverse employment action" requirement for a discrimination claim, the Supreme Court has stated that it is still an objective standard requiring "injury or harm" to the point that it "well might have 'dissuaded a reasonable worker'" from making a discrimination charge. Id. at 67-68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The acts must be shown to "significantly impact[] an employee's wages or professional advancement." *Jones*, 823 F. Supp. 2d at 745 (quoting *Halfacre v. Home Depot, U.S.A.*, 221 F. App'x 424, 433 (6th Cir. 2007)).

Jessup counseled Plaintiff for coming in late on January 20, 2017; this counseling did not have any impact on her pay. (Plaintiff's Dep., Doc. No. 13-1 at Page ID 265:3-23). Threatening to list someone as AWOL or accusing of taking leave without approval—without more—also does not rise to the level of injury or harm to be actionable. Plaintiff's allegation that she requested to be assigned to a GS-9 and an HR position but was denied also does not qualify as a materially adverse action. *Dollis v. Rubin*, 77 F.3d 777, 782 (5th Cir. 1995). Further, Plaintiff admitted in her deposition that her allegation about assignment to a GS-9 position was factually incorrect; there was not in fact a GS-9 position available in the office. (Id. at Page ID 346:1-349:11).

Plaintiff complains about not being reassigned to an HR position. She notes that a Caucasian female was offered to be reassigned to an HR position after Plaintiff was denied reassignment to the position but admits that the referenced HR position was a GS-9 position. Plaintiff was a GS-7 and the Caucasian female was a GS-9 at the time, so although the other female could be reassigned within the same grade, Plaintiff could not be reassigned due to the limitation

18

on GS-9 positions. Hymes Decl. January 8, 2017, Doc. No. 14-3 at Page ID 527-28. Neither this lack of reassignment nor the other identified acts qualify as materially adverse.

Plaintiff cannot demonstrate causation for her retaliation claims. Title VII's anti-retaliation provisions forbid materially adverse actions against an employee "because" she has engaged in protected conduct. 42 U.S.C. § 2000e-3(a). As a result, the plaintiff must show that the desire to retaliate was the "but for" cause of the alleged retaliatory act. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). This means Plaintiff must show that Defendant would not have taken the alleged retaliatory acts if she had not made prior EEO complaints. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) (en banc). "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

Plaintiff testified at her deposition that management "were after" her and B.P. for requesting the desk audit over the objection of management. Requesting a desk audit to determine whether a position is graded properly does not qualify as a protected activity. See *Stanley v. ExpressJet Airlines, Inc.*, 808 Fed. Appx. 351, 357 (6th Cir. 2020). Plaintiff also testified that management mistreated everyone in the CEOER and there were so many complaints of harassment and unfair treatment it led to a command directed investigation. She also painted Jessup as a supervisor who mistreated virtually everyone in the Customer Service section. Given all this, Plaintiff cannot demonstrate that her prior EEO Complaints (none of which named Jessup, save for the last one which she filed after her suspensions, Plaintiff's Dep., Doc. No. 13-1 at Page

ID 272:12-16) were the but-for cause for her denial of reassignment requests, counseling, being charged AWOL, and suspensions.

Even if Plaintiff could make out a *prima facie* case for retaliation, she cannot show that the Air Force's asserted legitimate, nondiscriminatory reasons for the alleged retaliatory actions were a pretext to hide unlawful retaliation. Once the employer articulates a legitimate, nonretaliatory reason for its actions, the plaintiff then bears the burden to show that the reason is actually a pretext to hide unlawful retaliation. *Michael*, 496 F.3d at 597. To demonstrate pretext, the "plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (en banc).

That a plaintiff might disagree with the facts a defendant describes does not create a genuine issue of material fact "as long as an employer has an honest belief in its proffered nonretaliatory reason." *Michael*, 496 F.3d at 598. The Air Force has asserted legitimate, nonretaliatory reasons for the actions against Plaintiff. She was not reassigned because there were no available positions in her grade. She was threatened with being charged AWOL, charged AWOL, and suspended because she did not provide administratively acceptable medical documentation, despite repeated requests from her supervisor. (May 16 Suspension, Doc. No. 14-13 at Page ID 578-82). Her failure to provide information about the beginning and end dates of her expected incapacitation made it difficult for her supervisor to plan for her absences and ensure her work was covered. (Jessup Decl., Doc. No. 14-1 at Page ID 511-13).

Plaintiff's interactions with her supervisor can be perceived as undermining his authority and creating hostility in the office. (Id. at Page ID 513). Defendant can utilize such actions to

attempt to modify Plaintiff's behavior so that the Customer Service section can function more effectively, unless Plaintiff can demonstrate these reasons are mere pretext for retaliation.

Next the Court considers Plaintiff's hostile work environment claim. In order to prove a hostile work environment claim, a plaintiff has to establish that (1) she was a member of a protected class; (2) she was subject to unwelcome harassment, based on sex, race discrimination, or disability; (3) the harassment resulted in an unreasonable interference with her work performance and created an objectively intimidating, hostile, or offensive work environment; and 4) there exists some basis for liability on the part of the employer. *Warf v. United States VA*, 713 F.3d 874, 878 (6th Cir. 2013) (citing *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008)).

In order to satisfy the third factor, the plaintiff must demonstrate that the workplace was "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). This involves factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." Id. (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).

Here, the acts Plaintiff highlights to demonstrate a hostile work environment—being counseled, not being reassigned, threatened with being charged AWOL, being charged AWOL, and being suspended—do not rise to the level of being pervasive enough to create a hostile work environment. None of these acts, alone or together, rise to the level of severe or pervasive enough to find hostile or abusive. Even if these acts were hostile, Plaintiff submits that the entirety of the Customer Service section was subjected to a hostile work environment during the relevant time

period and went so far to allege there was a "hostile work environment kind of mentality" in the Customer Service section. (Plaintiff's Dep., Doc. No. 13-1 at Page ID 197:7-21).

She called Jessup a "bully" who harassed nearly every single one of the people he supervised along with her, including Plaintiff's colleagues, who were white men and women. (See, Id. at Page ID 168:9-171:2; 271:4-13; 171:15-22; 202:11-204:1 (Rick Villars, a white male); 184:11-185:24; 187:18-21, 188:25-89:6 (C.E., a white female); Dep. 190:2-14 (Patty O'Brien, a white female); Dep. 209:23-210:10, 212:5-213:7 (B.P., a white male)). Plaintiff had "no trust in the integrity of Mr. Jessup." (Plaintiff's Points in Response to Notice of Proposed Suspension, Doc. No. 14-18 at Page ID 598-99, as authenticated in Plaintiff's Dep., Doc. No. 13-1 at Page ID 377:16-378:8).

According to Plaintiff, the CEOER had so many complaints of harassment, bullying, and unfair practices that a command directed investigation was conducted. The investigation found "the number one complaint[] was harassment and bullying and treating people unfairly, all of that stuff." (Plaintiff's Dep., Doc. No. 13-1 at Page ID 191:11-192:3, 194:14-195:3). In Plaintiff's view, a briefing on the investigation demonstrated "many, many, many, many, many, many complaints they had" which, in Plaintiff's words, were "all of the complaints I had." (Id. at Page ID 437:3-438:6). If the environment in the CEOER and Customer Services section in particular was so universally hostile, Plaintiff cannot demonstrate that she in particular was subjected to a hostile work environment because of her race, sex, disability, or prior protected activity. The claim will therefore be dismissed.

## IV.    Conclusion

Because Plaintiff has no direct evidence of discrimination and because Plaintiff cannot disprove Defendant's stated non-discriminatory reasons as pretext, and because the actions Plaintiff decries do not amount to a hostile work environment, Defendant's Motion for Summary Judgment (Doc. 16) is **GRANTED.** The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, February 7, 2023.


s/Thomas M. Rose
_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE